**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| K.F., an individual,<br><br>                        Plaintiff,<br><br>      v.<br><br>**CHOICE HOTELS INTERNATIONAL,**<br>**INC.; RED ROOF INNS, INC.; and**<br>**RED ROOF FRANCHISING, LLC.**<br><br>               Defendants. | Case No. 22-cv-3839<br><br>**JUDGE** _____<br>Related Cases: No. 19-cv-849<br>                No. 21-cv-4933<br>                No. 21-cv-4934<br>                No. 21-cv-4935<br>                No. 21-cv-5022<br>                No. 22-cv-1924<br>                No. 22-cv-2682<br>                No. 22-cv-2683<br>                No. 22-cv-2690<br>                No. 22-cv-2734<br>                No. 22-cv-3185<br>                No. 22-cv-3202<br>                No. 22-cv-3203<br><br>**DEMAND FOR JURY TRIAL** |

<u>**COMPLAINT**</u>

COMES NOW, the Plaintiff K.F. ("Plaintiff" or "K.F."), by and through her undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

<u>**INTRODUCTION**</u>

1. Plaintiff K.F. is a survivor of human sex trafficking.

2. K.F.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

3. K.F. met a person that groomed her into trafficking. Ultimately, her trafficker came to control every aspect of her life. The defining factor of the relationship between K.F. and her trafficker, was that each night, K.F.'s trafficker forced her to have sex with men for money.

4. K.F. was trafficked in hotels owned by Defendants[1] Choice Hotels International, Inc. ("Choice"), Red Roof Inns, Inc., and Red Roof Franchising, LLC.[2] K.F.'s trafficker rented hotel rooms for one purpose—a location to engage in sex trafficking.

5. At Defendants' hotels, K.F. was forced to engage in sex with many men every day. Every new customer was another instance K.F. was forced to have sex against her will—that is to say, K.F. was raped multiple times per day by multiple men when she stayed at Defendants' hotels.

6. K.F.'s trafficker forced her onto Defendants' property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

7. At some point, K.F. was able to escape the grasps of her trafficker and the prison of Defendants' hotel rooms.

8. K.F. has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of her trafficking.

9. K.F. brings this lawsuit in an attempt to hold the Defendants that imprisoned her accountable for their role in her trafficking.

## OVERVIEW OF TRAFFICKING

10. A significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

11. For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines

---

[1] Throughout this Complaint, when Plaintiff refers to "Defendants," that statement is alleged as to all Defendants named in this action, including Choice Hotels International, Inc., Red Roof Inns, Inc. and Red Roof Franchising, LLC. In the instances when Plaintiff alleges a fact as to only one Defendant, or some number of Defendants less than the total, the Complaint clearly names the Defendant to which the allegation is made.
[2] Defendants Red Roof Inns, Inc. and Red Roof Franchising, LLC will be collectively referred to as "Red Roof."

and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from the trafficking occurring on their properties.

12.     Defendants knew and have known for decades that they profit from sex trafficking repeatedly occurring under their brand flags.

13.     Rather than taking timely and effective measures to stop profiting from this epidemic, Defendants choose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented and Wi-Fi provided for this explicit and apparent purpose.

14.     The sex trafficking industry alone generates an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[3] However, traffickers aren't the only profiteers. The hotel industry, including Defendants, makes millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex. Defendants and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

15.     Defendants and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Defendants' own properties. Defendants and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project, created for the hospitality industry's use.

---

[3] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

16. The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Defendants and all industry participants continue to profit millions from participating in ventures in violation of § 1591(a).

17. Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of K.F. on their properties.

18. K.F., a survivor of sex trafficking, brings this action for damages against Defendants pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595 and the Child Abuse Victim's Rights Act, 18 U.S.C. § 2255. Each Defendant, knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1591(a).

**PARTIES**

19. Plaintiff K.F. is a natural person and a resident and citizen of Brewster, Ohio.

20. Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

    a. Due to the sensitive and intimate nature of the issues, Plaintiff K.F. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[4]

---

[4] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the

4

b.   Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[5] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[6] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[7]

c.   Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d.   Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[8]

e.   Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply

---

party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[5] Fed. R. Civ. P. 10(a).

[6] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[7] Fed. R. Civ. P. 26(c).

[8] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

5

seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

21. **<u>Defendant Choice Hotels International, Inc.</u>** is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its headquarters in Rockville, Maryland and can be served through its registered agent, United States Corporation Company, at 3366 Riverside Dr. Suite 103, Upper Arlington, OH 43221.

22. Choice owns, supervises, manages, controls, and/or operates the Quality Inn located at 3970 Convenience Circle NW, Canton, OH 44718 ("Canton Quality Inn").

a. The Canton Quality Inn by Choice is a Choice brand property.[9]

b. Choice employees work throughout the Canton Quality Inn by Choice. Choice employees work jobs including front desk and housekeeping. Choice is the principal with control over nearly every element of operations at the Canton Quality Inn by Choice. Choice is liable, either directly, vicariously, or indirectly through an agency relationship, for the acts and/or omissions of the employees at its branded hotels, including the Canton Quality Inn by Choice where K.F. was trafficked. Choice has an actual and apparent agency relationship with the physical property owners of the Canton Quality Inn by Choice as to establish vicarious liability.

---

[9] *Our Brands*, CHOICE HOTELS, https://www.choicehotels.com/about/brands (last visited Jun. 9, 26 2022).

c.  Choice controlled and dictated the actions of the Canton Quality Inn by Choice through highly specific and detailed brand standards, policies, and procedures.

d.  Choice knowingly benefited, or received something of value, from its ventures at the Canton Quality Inn by Choice through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where K.F. was trafficked, as well as in maintaining a positive public images for the Canton Quality Inn by Choice. Choice also benefited from gathering personal data from the Wi-Fi it provided to customers including K.F. and her trafficker.

e.  Choice is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio like the Canton Quality Inn by Choice, contracting to supply services in Ohio. Choice has derived substantial revenue from services rendered in Ohio.

f.  Whenever reference is made in this Complaint to any act, deed, or conduct of Choice, the allegation is that Choice engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Choice.

23.  **Defendant Red Roof Inns, Inc. ("RRI")** is a publicly traded company. The company provides franchise opportunities for its hotel and motel brands through **Defendant Red Roof Franchising, LLC ("RRF")**.[10] Red Roof purchases, owns, and manages a network of hotels

---

[10] Upon information and belief, Red Roof Franchising, LLC is a wholly owned subsidiary of Red Roof Inns, Inc. and serves as Red Roof Inns, Inc.'s franchising arm.

and motels globally, primarily in the Midwest, Southern, and Eastern United States. Red Roof serves customers throughout the United States and other countries throughout the World.

24. RRI is a global hotel brand with approximately 650 branded properties worldwide. It is a Delaware corporation, with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

25. RRI maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 3366 Riverside Dr. Suite 103, Upper Arlington, Ohio 43221.

26. RRF was named one of the fastest growing franchises in 2017. It is a Delaware limited liability company with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

27. RRF maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 3366 Riverside Dr. Suite 103, Upper Arlington, Ohio 43221.

28. Red Roof owns, supervises, manages, controls, and/or operates the Red Roof Inn located at 5353 Inn Cir NW, North Canton, OH 44720 ("North Canton RRI").

    a. The North Canton RRI by Red Roof is a Red Roof branded property.[11]

    b. Red Roof employees work throughout the North Canton RRI by Red Roof. Red Roof employees work jobs including front desk and housekeeping. Red Roof is the principal with control over nearly every element of operations at the North Canton RRI by Red Roof. Red Roof is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or

---

[11] *Our Brands*, RED ROOF, https://www.redrooffranchising.com (last visited Jun. 9, 2022); *Red Roof Inn*, RED ROOF, https://www.redrooffranchising.com/red-roof-inn (last visited Jun. 9, 2022).

omissions of the employees at its branded hotels, including the North Canton RRI by Red Roof where K.F. was trafficked.[12] Red Roof has an actual and apparent agency relationship with the physical property owner of the North Canton RRI by Red Roof as to establish vicarious liability.

c. Red Roof controlled and dictated the actions and inactions of the North Canton RRI by Red Roof through highly specific and detailed brand standards, policies, and procedures.

d. Red Roof knowingly benefited, or received something of value, from its commercial business ventures at the North Canton RRI by Red Roof through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where K.F. was trafficked, as well as in maintaining a positive public image for the Red Roof Inn brand. Red Roof also benefited from gathering personal data from the Wi-Fi it provided to customers including K.F. and her trafficker.

e. Red Roof is subject to the jurisdiction of this Court because its corporate offices are headquartered in this district. In addition, Red Roof regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio like the North Canton RRI by Red Roof, contracting to supply services in Ohio. Red Roof has derived substantial revenue from services rendered in Ohio.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of Red Roof, the allegation is that Red Roof engaged in the act, deed, or conduct

---

[12] See, e.g., *Revenue Management*, RED ROOF, https://www.redrooffranchising.com/revenue- management (last visited Jun. 9, 2022) (proclaiming "Our Team is an Extension of Yours").

9

by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Red Roof.

**JURISDICTION AND VENUE**

29. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and under 18 U.S.C. § 1595 and 18 U.S.C. § 2255 because this action arises under the laws of the United States.

30. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1391(d).

31. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants Red Roof Inns, Inc. and Red Roof Franchising, LLC have their principal place of business within this District.

32. Pursuant to Southern District of Ohio Local Rule 3.1(b), this case is related to Case Nos. 2:2021-cv-04935, 2:2019-cv-00849, 2:2021-cv-04933, 2:2021-cv-04934, 2:2022-cv-01924, 2:2021-cv-05022, 2:2022-cv-02682, 2:2022-cv-02683; 2:2022-cv-02690; 2:2022-cv-02734 2:2022-cv-03185; 2:2022-cv-03202; and 2:2022-cv-03203 currently pending before Chief Judge Algenon L. Marbley.

**FACTUAL BACKGROUND**

INTRODUCTION

33. K.F. brings her claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a) and the Child Abuse Victims' Rights Act ("CAVRA") 18 U.S.C. § 2255.

10

34. The TVPRA prohibits Defendants from profiting from any venture they know or should know involves a violation of § 1591, and thereby establishes a non-delegable duty of reasonable care.

35. An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[13] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Defendants' Wi-Fi to advertise and solicit victims for commercial sex against their will.

36. As part of their conspiracy, to save costs and continually reap millions of dollars in profits, Defendants generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding suspected incidents of human trafficking at the branded properties. Furthermore, Defendants, did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

37. Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Defendants did not establish mandatory and secure reporting mechanisms at the point of sale.

38. With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like K.F. to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties while Defendants reap the benefits.

---

[13] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

39. Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

40. Defendants are jointly and severally liable for the Plaintiff's damages in this case.

**THE SEX TRAFFICKING OF PLAINTIFF K.F.**

41. K.F. met her trafficker when she was just fifteen (15) years old.

42. By means of a combination of force, coercion, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, K.F. was held captive and sold for sex by her trafficker.

43. During the time that she was trafficked, K.F.'s trafficker frequently rented rooms at the Defendants' hotel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with K.F.

44. Throughout her trafficking, K.F.'s trafficker connected with "johns" by posting or causing to be posted advertisements on Skip the Games advertising for K.F.'s availability for commercial sex at Defendants' locations. K.F.'s trafficker posted many of these advertisements and had conversations with "johns" while connected to Defendants' Wi-Fi.

45. K.F. was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels.

46. From approximately 2019 to March 2020, while under the coercive control of her trafficker, K.F. was imprisoned in hotel rooms rented by her trafficker who forced her to have sex for money. During that time, K.F. was trafficked in the following hotels:

    a. Canton Quality Inn located at 3970 Convenience Circle NW, Canton, OH 44718;

b. North Canton RRI located at 5353 Inn Cir NW, North Canton, OH 44720.

47. During the time she was trafficked, K.F.'s trafficker constantly shuffled her back and forth among hotels, often visiting the same hotels repeatedly at intervals.

48. While at the Defendants' hotels, K.F.'s trafficker psychologically tormented her by withholding food and water, all to ensure that she could not escape.

49. During her captivity at Defendants' hotels, K.F. was raped, psychologically tormented, kidnapped, and imprisoned in Defendants' brand hotels listed above.

50. At the above-listed hotels, K.F. encountered the same staff on multiple occasions. Defendants' staff would have seen the signs of K.F.'s deterioration brought on by the abuse perpetrated by her trafficker.

51. Every time K.F. interacted with Defendants' staff, it was readily apparent that K.F. was under the control of her trafficker. K.F.'s trafficker checked in to Defendants' hotels using her own identification.

52. The trafficker of K.F. followed a repetitive and routine procedure during stays at the Defendants' hotels to which Defendants' hotels knew or should have known of K.F.'s trafficking because of a variety of factors detailed below:

**THE SEX TRAFFICKING OF K.F. AT THE CANTON QUALITY INN BY CHOICE**

53. K.F. was subjected to sex trafficking at the Choice branded, Canton Quality Inn located at 3970 Convenience Circle NW, Canton, OH 44718.

54. K.F. and her trafficker stayed at this Canton Quality Inn by Choice from approximately January to June 2019, frequently staying for days at a time within this period.

55. At the Canton Quality Inn by Choice, there was constant foot traffic in and out of K.F.'s room. At all hours of the day and the night, the staff witnessed "johns" come to and from K.F.'s room. Many of these "johns" would ask the front desk staff for K.F. or her trafficker. The

13

staff also had access to video footage documenting the constant foot traffic in and out of K.F.'s room from security cameras likely placed throughout the hotel.

56. At the Canton Quality Inn by Choice, K.F. was dressed very suggestively for her age in public areas of the hotel and was often accompanied by men significantly older than her.

57. Further, with each stay at the Canton Quality Inn by Choice, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Requesting a room away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large number of male visitors asking for K.F. and her trafficker at the front desk and coming in and out of K.F.'s room; Women wearing clothing inappropriate for the weather; and Loitering and soliciting on hotel grounds.

58. Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at the Canton Quality Inn by Choice.

59. These red flags were open and obvious to anyone working at the Canton Quality Inn by Choice and lasted continuously for months.

**THE SEX TRAFFICKING OF K.F. AT THE NORTH CANTON RRI BY RED ROOF**

60. Plaintiff K.F. was subjected to sex trafficking at the Red Roof branded, North Canton RRI located at 1800 Miami St, Canton, OH 43605.

61. Plaintiff and her trafficker stayed at the North Canton RRI by Red Roof from approximately January to March 2019, frequently staying for days at a time within this period.

62. During one stay at the North Canton RRI by Red Roof, K.F.'s trafficker got into a fight with someone in the parking lot. Although the police arrived in response to the incident, K.F.'s trafficker was not arrested, and K.F. and her trafficker were permitted to return to the hotel.

63.     At the North Canton RRI by Red Roof, K.F. was dressed very suggestively for her age in public areas of the hotel, even in the winter months, and was often accompanied by men significantly older than her.

64.     At the North Canton RRI by Red Roof, there was constant foot traffic in and out of K.F.'s room. At all hours of the day and the night, the staff witnessed "johns" come to and from K.F.'s room. Many of these "johns" would ask the front desk staff for K.F. or her trafficker. The staff also had access to video footage documenting the constant foot traffic in and out of K.F.'s room from security cameras likely placed throughout the hotel.

65.     There was a bar inside the North Canton RRI by Red Roof where staff regularly interacted with K.F. and other victims. The staff occasionally offered K.F., who was obviously a minor, and the other victims trafficked with her  drinks "on the house" at no charge. Further, with each stay at the North Canton RRI by Red Roof, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Requesting a room away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large number of male visitors asking for K.F. and her trafficker at the front desk; Unusually large number of male visitors coming in and out of K.F.'s room; and Loitering and soliciting on hotel grounds.

66.     Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at North Canton RRI by Red Roof.

67.     These red flags were open and obvious to anyone working at North Canton RRI by Red Roof and lasted continuously for months.

## DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR LOCATIONS

68.     Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[14] The United Nations,[15] international non-profits,[16] and the U.S. Department of Homeland Security,[17] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

69.     For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

---

[14] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[15] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[16] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[17] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

70.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[18] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[19] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

71.     The Defendants, on information and belief, have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking.  The Defendants nevertheless do not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

72.     The Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

73.     The Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

---

[18] *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heino us%20crime.

[19] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

74. A brief examination of just a handful of examples for each Hotel Defendant suffices to show the extraordinary frequency with which the Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations:

**CHOICE**

a. Regarding a stay in October 2021 at the Canton Quality Inn by Choice, a hotel customer wrote a review saying, "There were approx half a dozen shady characters hanging around in front and on the side of the hotel. Honestly I felt like cancelling the reservation before I even walked in. It gave the impression that this was some type of hangout. In fact when we came home there were men sitting in two cars in front of our room engaging in what appeared to be a drug deal. In the morning when we left there was another group of shady characters hanging out in front."

b. Regarding a stay in August 2012 at a Choice branded, Rodeway Inn located at 6880 Sunset Strip Ave NW I-77 at Exit 111, North Canton, OH 44720, close to the Canton Quality Inn by Choice, a hotel customer wrote a review saying, "I rented the room to which there were dirty-looking men walking around with beers in their hands, literally standing in their room doorway and hitting on me as I was unpacking my trunk to go into my room. There were flies in the room, room VERY dirty with stains on the walls, carpets and the bed sheets. As soon as I checked in, 5 minutes later, my phone kept ringing from other rooms from guys asking me if they can come over to F me. I am NOT lying about this - why would I bother? I canNOT believe this motel hasn't been condemned or turned in. Men walking around in women's

clothing like hookers from room to room. I wasn't there 20 minutes and went and asked for a full refund and got the F out of there. STAY AWAY from this motel if you want safety for you and your children."

c. In 2017, an investigation revealed human trafficking ring was operating out of Econolodge in Cleveland, close to the Canton Quality Inn by Choice.[20]

**RED ROOF**

d. Regarding a stay in June 2020 at the North Canton RRI by Red Roof, a hotel customer wrote a review saying, "The first thing I noticed is there was a lot of people drinking and looks like there's a lot of drug activity and when I was checking in the front desk girl smells like booze I believe her name was jody . And I walk into the room and the floors are dirty bathroom was dirty and she's had hair all over them..."

e. In 2017, an FBI prostitution sting at a Red Roof Inn in Akron, Ohio, close to the North Canton RRI by Red Roof, led to six arrests.[21]

## DEFENDANTS FACILITATED THE TRAFFICKING OF K.F.

75. Each Defendant is a signatory of the Code[22] and thereby has promised to adopt these policies to combat trafficking. Yet, Defendants have failed to implement most, if not all these policies, and continue to unlawfully benefit from the trafficking on their properties.

76. Defendant Choice is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Choice publicly committed

---

[20] Cory Shaffer, *Woman pleads guilty to prostitution charges, agrees to testify against accused Warrensville Heights pimps,* CLEVELAND.COM (March 20, 2017)
https://www.cleveland.com/metro/2017/03/woman_pleads_guilty_to_prostit_1.html
[21] Tara Molina, Prostitution bust: Summit Co. investigators, FBI arrest six at Springfield Township Red Roof Inn, NEWS 5 (August 1, 2017) https://www.news5cleveland.com/news/local-news/oh-summit/prostitution-bust-summit-co-investigators-fbi-arrest-six-at-springfield-township-red-roof-inn
[22] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Choice should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

77. Defendant Red Roof is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Red Roof publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Red Roof should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

78. Defendants profited from the sex trafficking of Plaintiff K.F. Defendants rented rooms to and provided Wi-Fi to K.F.'s trafficker when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where K.F. was trafficked. The hotel staff, especially front desk staff at Defendants properties, knew or should have known of the obvious signs of K.F.'s trafficking.

79. Defendants benefited from the steady stream of income that K.F.'s trafficker and "johns" bring to their hotel brands. Defendants profited from each and every room that K.F.'s trafficker and customers rented where K.F. was harbored and maintained for the purpose of sex trafficking. In addition, Defendants profited from data collected each and every time K.F.'s trafficker and customers used Defendants' Wi-Fi to advertise and solicit K.F. for commercial sex.

80. Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of the benefits they were receiving from the human trafficking occurring at the locations where K.F. was trafficked given Defendants access to information, such as police reports,

20

news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

81.     Moreover, Defendants repeatedly collected data on K.F., her trafficker, and her "johns" from her many stays at Defendants hotels, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendant's employees witnessed the obvious signs of K.F.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Defendants failed to take reasonable measures to stop benefitting from sex trafficking occurring in their hotels. If Defendants had taken proper measures, Defendants would not have profited from K.F. and other victims like her being trafficked at their locations.

82.     Defendants discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotels where K.F. was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

83.     Pursuant to these policies, Defendants' employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the properties where K.F. was trafficked reported this to Defendants or would have if Defendants did not fail to institute reasonable policies and procedures.

21

84. In addition, Defendants had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

85. Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties. Defendants maintained their deficiencies to maximize profits by:

   a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

   b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

   c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

   d. Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

   e. Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

   f. Failing to institute proper security measures, including, but not limited to,

22

employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

86. As a direct and proximate result of these egregious practices on the part of the Defendants, K.F. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## DEFENDANTS' CONTROL OVER THEIR BRAND HOTELS

87. Upon information and belief, it is a standard practice in the hospitality industry, followed by both Defendants, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

88. Defendants provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

89. Defendants provide their branded properties brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System (GDS) and other online travel agency databases, as well as with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus,

23

booking and room reservations are to a substantial extent controlled by Defendants.[23] Defendants see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.[24]

90.     Upon information and belief, Defendants require their branded hotel properties to use a property management system, which is linked to Defendants' corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

91.     Upon information and belief, per the relevant franchise agreements,[25] Defendants may enforce their brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

## CHOICE

92.     Choice exercises day-to-day control over the Canton Quality Inn by Choice and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Choice implements and retains brand hotel control over, including control over the Canton Quality Inn by Choice and, as either direct subsidiaries or under the terms of its franchise agreements.

93.     Upon information and belief, Choice controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a.  Requiring the branded locations to use Choice's property management system;

    b.  Gathering reports of data generated by branded locations including

---

[23] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel- industry/.

[24] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

[25] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

reservation, payment, and occupancy information through Choice's centralized systems;

c. Requiring branded locations to keep audit reports and other records;

d. Conducting regular inspections for compliance with franchise agreement terms and Choice's rules and regulations;

e. Providing marketing requirements and standardized marketing services for the branded locations;

f. Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

g. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

h. Requiring branded locations to install Choice's data transport system to share data with Choice corporate;

i. Providing training and orientation materials for branded property staff;

j. Requiring branded locations to make modifications to the branded properties upon Choice's request and to refrain from make substantial changes to the branded property without Choice's permission;

k. Regulating the rates for room rentals; and

l. Insurance coverage requirements.[26]

94. Choice manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies

---

[26] See e.g. Comfort Inn 2020 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/comfort-inn-2020-fdd-franchise-information-costs-and-fees/

published and communicated via property management systems with back-end management by Choice.[27]

95. Choice controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Choice's website, and mentions across its corporate media channels.[28]

96. Choice mandates usage of a cloud-based centralized property management system called ChoiceADVANTAGE to its branded locations.[29]

97. Choice controls all hotel reservations made across its branded locations on its centralized reservation system called Choice Edge.[30]

98. Through its national sales team, Choice controls the credit processing system and the centralized direct billing at its brand hotels, including the Canton Quality Inn by Choice.[31]

99. Choice gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[32]

100. Upon information and belief, Choice requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives Choice the ability to access, monitor, and harvest that internet data.

101. Under the guise of maintaining its "brand standards," Choice also forces its branded hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well

---

[27] *See* e.g. *Why Choice?,* CHOICE, https://choicehotelsdevelopment.com/why-choice (last visited Jun. 9, 2022). id. ("We've taken our teams' collective knowledge of hotel operations, technology, service and leadership, and developed the tools and resources our owners use every day to help run their businesses.").
[28] *Id.*
[29] *Connect the world through the power of hospitality*, CHOICE, https://www.choicehotels.com/about
[30] *Supra* n 101
[31] *Id.*
[32] Choice Hotels International, Inc. *Privacy & Security Policy,* https://www.choicehotels.com/legal/privacy-policy

as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[33]

102. Choice requires branded properties to comply with its corporate policies relating to Security and Guest Safety, Human Rights, Ethics, Corporate Governance, and compliance with the law.[34]

**RED ROOF**

103. Red Roof exercises day-to-day control over the North Canton RRI by Red Roof and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Red Roof implements and retains brand hotel control, including control over the North Canton RRI by Red Roof, as either direct subsidiaries or under the terms of its franchise agreements.

104. Red Roof controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a. Providing the software, hardware, and platforms where data and information is shared with Red Roof corporate;

    b. Providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

    c. Providing training and education to branded hotels through webinars, seminars, conferences, and online portals;

    d. Providing and controlling customer review and response platforms;

---

[33] *See e.g.*, *Convert an Existing Hotel*, CHOICE HOTELS, https://choicehotelsdevelopment.com/ convert-a-hotel/#upscale (last visited Jun. 9, 2022).

[34] Choice claims to "strive to conduct [its] business operations free from violations of human rights" *See Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Jun. 6, 2022).

e.   Hosting online bookings on Red Roof's domain;

f.   Requiring branded hotels to use Red Roof's customer rewards program;

g.   Requiring branded hotels to use Red Roof's property management software;

h.   Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

i.   Providing IT support for all property management systems, owned, operated, and required by Red Roof;

j.   setting employee wages;

k.   sharing profits;

l.   standardizing training methods for employees;

m.  building and maintaining the facility in a manner specified by the owner;

n.   standardized or strict rules of operation;

o.   regular inspection of the facility and operation by owner; and

p.   fixing prices.[35]

105.   Red Roof manages corporate training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Red Roof.[36]

106.   Red Roof controls uniform and required reservation, marketing, customer support systems and loyalty programs at its brand hotels, including the North Canton RRI by Red Roof.[37]

---

[35] *See* 2021 Franchisee Disclosure Document, https://franchimp.com/?page=pdf&f=105990_2021.pdf

[36] *See e.g.*, *Brand Support*, RED ROOF, https://www.redrooffranchising.com/brand-support (last visited Jun. 9, 2022) ("We support our franchisees with extensive on-site training. On everything from helping with pricing strategy and operational expense management, to assistance with marketing and operation programs…Our cost-effective sourcing solutions, efficient technology support, and incredible property management system add even more value to your Red Roof franchise.")

[37] *Id.*

Red Roof also advertises its brand hotels through national press releases, newsletters, emails, announcements on redroof.com, and mentions across its corporate media channels.[38]

107. Red Roof requires its hotels to use a consolidated IT system and database for property management, credit processing and centralized billing, as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated.[39]

108. Red Roof boasts of its "Streamlined Technology" and "Shared Success" with its brand hotels. To "make operations as easy and seamless as possible," Red Roof controls "a fully integrated database" which its brand hotels must use to access customer data and reservations, among other information shared system-wide between Red Roof and its brand hotels.[40] Red Roof's privacy policy states that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.[41]

109. Red Roof also sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the North Canton RRI by Red Roof.[42]

---

[38] *Brand Marketing*, RED ROOF, https://www.redrooffranchising.com/brand-marketing (last visited Jun. 9, 2022) ("From your grand opening to being fully operational, our team helps you market your property every step of the way. We provide property-specific design services for print materials—like flyers and rack cards—and even help with billboards, transit advertising, and other local promotional needs.")

[39] *See* Red Roof Franchising, available at https://www.redrooffranchising.com/technology; *See also Sales Team,* RED ROOF, https://www.redrooffranchising.com/sales-team (last visited Jun. 9, 27 2022) (corporate Red Roof employees provide brand staff with "regional events, webinars, and in-person visits" alongside training, other support, and "RediBill® Brand-Wide Direct Billing" centralized billing program).

[40] *Technology*, RED ROOF, https://www.redrooffranchising.com/technology (last visited Jun. 9, 2022); see also *Privacy Policy*, RED ROOF, https://www.redroof.com/privacy-policy (last visited Jun. 9, 2022).

[41] *Id.*

[42] *See* sigmawifi Red Roof Inn Case Study, *available at* https://www.sigmawifi.com/red-roof-inn-nh-case-study/

110.     In addition, through an integrated corporate marketplace, Red Roof mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the North Canton RRI by Red Roof.[43]

111.     Under the guise of maintaining its "brand standards," Red Roof forces its brand hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[44]

112.     Red Roof posts job openings for its branded properties on its central career positing website.[45] Red Roof provides benefits to employees of its branded properties, and upon information and belief controls the terms and conditions of their employment.[46]

## CAUSES OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA")
### (AGAINST ALL DEFENDANTS)

113.     Plaintiff incorporates each foregoing allegation.

114.     Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

115.     Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached

---

[43] See *Operational Support Procurement Services*, RED ROOF, https://www.redrooffranchising. com/operational-support (last visited Jun. 6, 2022).

[44] *See Design and Construction,* RED ROOF, https://www.redrooffranchising.com/design-and-constuction (last visited Jun. 9, 2022).

[45] *See* https://www.redroofjobs.com/

[46] *Id.*

this duty through their participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her trafficker for the purposes of commercial sex induced by force, fraud, or coercion.

116. Defendants have benefited as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Defendants directly benefitted from the sex trafficking of Plaintiff when they knew or should have known violations of §1591(a) were occurring. The actions, omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages.

117. Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels.

### COUNT 2: 18 U.S.C. § 2255(A) CHILD ABUSE VICTIMS RIGHTS ACT ("CAVRA") (AGAINST ALL DEFENDANTS)

118. Plaintiff incorporates each forgoing allegation

119. Plaintiff was a "minor" pursuant to 18 U.S.C. § 2255(a) when she was trafficked.

120. Plaintiff was the "victim" of violations of 18 U.S.C. §§ 1589, 1590, and 1591.

121. Plaintiff suffered "personal injury" pursuant to 18 U.S.C. § 2255(a) as a result of those violations.

122. Plaintiff was a "person" who "has not attained the age of 18 years" pursuant to 18 U.S.C. § 1591(a)(2).

123. Defendants knew or should have known that means of force, threats of force, fraud, coercion, or any combination of those means would be used to cause Plaintiff to engage in a commercial sex act, pursuant to 18 U.S.C. § 1591(a)(2).

124.     Defendants knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing her and her trafficker rooms in hotels and Wi-Fi used advertise Plaintiff and solicit customers affecting interstate commerce where authorities were unlikely to discover the injuries being sustained by Plaintiff.

125.     Defendants knowingly benefited, financially or by receiving anything of value, from participation in ventures of renting rooms and providing Wi-Fi that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff to engage in commercial sex acts.

126.     Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a. Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b. Disgorgement of profits obtained through unjust enrichment;

c. Restitution;

d. Statutory and/or treble damages, where available;

e. Punitive damages;

f.  Attorneys' fees and expenses;

g.  The costs of this action;

h.  Pre- and post-judgment interest; and

i.  Any other relief the Court or jury deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by struck jury.

Dated: October 28, 2022

Respectfully submitted,

/s/ Steven C. Babin, Jr.
Steven C. Babin, Jr. (0093584)
Jennifer J. El-Kadi (00100660)
Kristina Aiad-Toss (0101336)
Morgan Harper (*pro hac vice forthcoming)*
**Babin Law, LLC**
65 East State Street, Suite 1300
Columbus, Ohio 43215
T: 614-761-8800
E: steven.babin@babinlaws.com /
Jennifer.elkadi@babinlaws.com /
Kristina.aiad-toss@babinlaws.com /
Morgan.harper@babinlaws.com

33